**INDEPENDENT INSURANCE AGENTS OF AMERICA, INC., Petitioner,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

**Merchants National Corporation, The National Association of Casualty and Surety Agents, The National Association of Life Underwriters, The National Association of Professional Insurance Agents, and The National Association of Surety Bond Producers, Intervenors.**

**No. 559, Docket 87–4118.**

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1987.

Decided Jan. 25, 1988.

Jonathan B. Sallet, Washington, D.C. (Jamie S. Gorelick, Jay L. Alexander, Miller, Cassidy, Larroca & Lewin, Washington, D.C., on brief), for petitioner and ins. agent intervenors.

Richard M. Ashton, Assoc. Gen. Counsel, Washington, D.C. (Richard K. Willard, Asst. Atty. Gen., U.S. Dept. of Justice, Michael Bradfield, Gen. Counsel, Douglas B. Jordan, Bd. of Governors of Fed. Reserve System, Washington, D.C., on brief), for respondent.

James A. McDermott, Indianapolis, Ind. (Stanley C. Fickle, Barnes & Thornburg, Indianapolis, Ind., on brief), for intervenor Merchants Nat. Corp.

Paul B. Galvani, Martin E. Lybecker, William L. Patton, Alan G. Priest, Mark P. Szpak, Ropes & Gray, Washington, D.C., on brief as amici curiae for ins. co. associations.

John J. Gill, Gen. Counsel, Michael F. Crotty, Assoc. Gen. Counsel, American Bankers Assn., and Richard Whiting, Ass'n of Bank Holding Companies, Washington, D.C., on brief as amici curiae for American Bankers Ass'n and Ass'n of Bank Holding Companies.

John L. Warden, H. Rodgin Cohen, Michael M. Wiseman, Lauretta E. Murdock,

Charles S. Sullivan, Sullivan & Cromwell, New York City, on brief as amicus curiae for New York Clearing House Ass'n.

Linley E. Pearson, Atty. Gen., J. Gordon Gibbs, Jr., Chief Counsel, Samuel L. Bolinger, Deputy Atty. Gen., Indianapolis, Ind., on brief as amicus curiae for Indiana Dept. of Financial Institutions.

James T. McIntyre, Jr., Leslie A. Dent, Hansell & Post, Washington, D.C., on brief as amicus curiae for Ins./Financial Affiliates of America, Inc.

James F. Bell, Ernest Gellhorn, Carol R. Van Cleef, Imran M. Raschid, Jones, Day, Reavis & Pogue, and Arthur E. Wilmarth, Jr., George Washington Univ. Nat. Law Center, Washington, D.C., on brief as amicus curiae for Conference of State Bank Supervisors.

Before NEWMAN, CARDAMONE, and PIERCE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

The Independent Insurance Agents of America ("IIAA") petition for review of an order of the Board of Governors of the Federal Reserve System ("the Board" or "the Fed") permitting two Indiana state banks recently acquired by the Merchants National Corporation, a bank holding company, to resume specified insurance activities permitted under Indiana state law. The Board's approval rested upon a determination that the non-banking prohibitions of section 4 of the Bank Holding Company Act, as amended, 12 U.S.C. § 1843 (1982), do not apply to the insurance activities of the banking subsidiaries of bank holding companies. *Merchants National Corp.*, 73 Fed.Res.Bull. 876 (Sept. 10, 1987). For purposes of this appeal, the critical aspect of the Board's order is its conclusion that the order is not precluded by the moratorium Congress imposed upon federal bank-

ing agencies prohibiting for one year the approval of certain nonbanking activities. The moratorium is contained in Title II of the Competitive Equality Banking Act of 1987 (CEBA), Pub.L. No. 100–86, §§ 201–205, 101 Stat. 552, 581–85 (1987) (to be codified at 12 U.S.C. § 1841 note). Section 201(b)(3) of the CEBA prohibits any federal banking agency from issuing, between March 6, 1987, and March 1, 1988, any rule, regulation, or order that would "have the effect of increasing the insurance powers" of any entity subject to the Bank Holding Company Act, and section 201(b)(4) specifically prohibits the Fed from approving the "acquisition" by a bank holding company of any entity, including a state-chartered bank, engaging in those insurance activities prohibited under section 4 of the Bank Holding Company Act. We hold that the Board's *Merchants National* order is within the scope of the moratorium and therefore grant the petition for review and vacate the order.

### The Statutory Framework

Before introducing the facts, it will be helpful to outline the pertinent statutory provisions of both the Bank Holding Company Act and the Competitive Equality Banking Act.

*The Bank Holding Company Act of 1956.* Though our disposition makes it unnecessary to rule on the Board's interpretation of section 4 of the Bank Holding Company Act, a brief mention of the Act's structure is appropriate as background. Briefly, the principal regulatory powers of the Fed under the Bank Holding Company Act are set forth in sections 3 and 4 of the Act. 12 U.S.C. §§ 1842, 1843. Section 3 requires Board approval of the acquisition of ownership or control of any bank by a bank holding company with narrow exceptions not here relevant.[1] Section 3 sets forth factors governing acquisition approv-

---

1. Section 2 of the Act defines the term "bank holding company" in extensive detail, but for our purposes it may be understood simply as any company "which has control over any bank." 12 U.S.C. § 1841(a)(1). Until this year, a "bank" has been defined generally as any institution organized under state or federal law "which (1) accepts deposits that the depositor

has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U.S.C. § 1841(c). Though not pertinent to the outcome of this appeal, it should be noted that this latter definition has been substantially amended by Title I of the Competitive Equality Banking Act of 1987, Pub. L. No. 100–86, § 101(a), 101 Stat. 552, 554.

al, focusing on the competitive effect of the proposed acquisition, the financial and managerial resources of both the holding company and the acquired bank, and the convenience and needs of the community served. 12 U.S.C. § 1842(c).

Section 4 of the Act, the focal point of the Board's order in this case, regulates the non-banking activities of a bank holding company. Without intimating our views on the correctness of the Board's interpretation of the precise scope of section 4, it is sufficient to point out generally that section 4(a) prohibits a bank holding company from engaging in non-banking activities other than those permitted under section 4(c)(8) of the Act. Section 4(c)(8) sets forth the so-called "closely related to banking" exception to the non-banking provision. In relevant part, section 4(c)(8) states that the section 4(a) nonbanking prohibitions shall not bar ownership by a bank holding company of:

> shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto, but for purposes of this subsection it is not closely related to banking or managing or controlling banks for a bank holding company to provide insurance as a principal, agent or broker....

12 U.S.C. § 1843(c)(8).

*The Competitive Equality Banking Act of 1987.* Title II of the CEBA [2] imposes a moratorium, effective between March 6, 1987, and March 1, 1988, on the exercise of federal banking agency authority relating to specified non-banking activities, including securities, real estate, and insurance activities of bank holding companies or their subsidiaries in order that Congress may have the opportunity to "conduct a comprehensive review of our banking and financial laws and to make decisions on the

need for financial restructuring legislation in the light of today's changing financial environment ... before the expiration of such moratorium." CEBA, § 203(a).

That part of the moratorium statute relating to insurance activities of bank holding companies and their subsidiaries is divided into two primary substantive subsections. Section 201(b)(3) of Title II states:

> A Federal banking agency *may not issue any* rule, regulation, or *order that would have the effect of increasing the insurance powers of* banks, *bank holding companies,* foreign banks or other companies subject to the Bank Holding Company Act of 1956 under section 8(a) of the International Banking Act of 1978, *or banking* or nonbanking *subsidiaries thereof* with respect to any activities in the United States, either with respect to specific banks or bank holding companies or subsidiaries thereof or generally beyond those expressly authorized for bank holding companies under subparagraphs (A) through (G) of section 4(c)(8) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(c)(8)(A) through (G)).

(Emphasis added).

Section 201(b)(4) contains the second moratorium provision relating to insurance, and specifically concerns the Fed. This provision states that during the moratorium period the Board

> may not approve the acquisition by a bank holding company or by a foreign bank or other company subject to the Bank Holding Company Act of 1956 under section 8(a) of the International Banking Act of 1978, *of* any company, including a *State-chartered bank, unless the bank holding company,* foreign bank, or other company *has agreed to limit the insurance activities in the United States of the company to be acquired to those permissible under section 4(c)(8)* of the Bank Holding Company Act of 1956.

---

**2.** The other principal titles of the 1987 Act, among other things, amend the definition of the term "bank" as used in the Bank Holding Company Act (Title I), provide recapitalization for the Federal Savings and Loan Insurance Corporation (Title III), establish in the Federal Depos-

it Insurance Corporation emergency authority over failing banks (Title IV), clarify the role of the National Credit Union Administration (Title V), and set forth regulations relating to the practices of depository institutions delaying the availability of deposited funds (Title VI).

(Emphasis added). Finally, section 202 of Title II states that nothing in the section 201 moratorium provisions is intended to prevent a regulated agency from issuing any rule, regulation, or order pursuant to preexisting legal authority "to expand the securities, insurance, or real estate powers of banks or bank holding companies ... if the effective date of such rule, regulation, or order is delayed until the expiration" of the moratorium period, March 1, 1988.

### The Facts

A number of states, including Indiana,[3] historically have authorized state-chartered banks to provide insurance services to their customers. On July 1, 1986, Merchants National Corporation, a bank holding company within the meaning of the Bank Holding Company Act, 12 U.S.C. § 1841(a), sought permission from the Fed to acquire the stock of two banks chartered under the laws of the State of Indiana, the Anderson Banking Company ("Anderson Bank") and the Mid State Bank of Hendricks County ("Mid State Bank"). Both of these state banks had engaged in general insurance activities prior to the date of Merchants National's applications, Anderson Bank directly since its incorporation in 1916, and Mid State Bank since its purchase of an insurance agency in 1985.[4]

The initial Merchants National applications were protested by various insurance industry trade groups, including the IIAA, on the ground that the provisions of section 4 of the Bank Holding Company Act apply to the insurance activities of state banks owned by bank holding companies and therefore that the acquisitions of Anderson Bank and Mid State Bank could not be approved without requiring termination of their insurance activities to the extent required under section 4. In response to the protests, Merchants National committed that it would cause the banks to divest their insurance agency activities within two years unless, within that time, it received

Board approval for the banks to retain their insurance activities. Merchants National agreed that, prior to such approval, the banks would limit their insurance activities to the renewal of existing policies. In light of these commitments, the Board approved the applications on October 29, 1986. 72 Fed.Res.Bull. 838 (1986).

On February 5, 1987, Merchants National filed an application seeking Board approval for Anderson Bank and Mid State Bank to resume the insurance activities that had just been suspended pursuant to the acquisition commitments. Merchants National sought permission on two alternative grounds. First, it contended that Anderson Bank and Mid State Bank were exempt from the insurance provisions of section 4 of the Bank Holding Company Act pursuant to the "grandfather" provisions of section 4(c)(8)(D), as amended, under which a bank holding company or any of its subsidiaries is permitted to engage in insurance agency activity in which the holding company or the subsidiary was engaged on May 1, 1982, subject to certain geographical and functional limitations. Second, Merchants National sought more broadly a determination that the non-banking prohibitions of section 4 of the Act do not apply to activities conducted directly by banking subsidiaries of a bank holding company.

After giving interested parties an opportunity to comment, *see* 52 Fed.Reg. 8966, 8967 (March 20, 1987), the Board on September 10, 1987, issued the order challenged on this appeal, permitting the two Indiana banks to resume their insurance activities. The Board ruled first that the grandfather provision in section 4(c)(8)(D) of the Bank Holding Company Act was inapplicable because that provision insulates only those entities that were bank holding companies or their subsidiaries as of May 1, 1982. Neither Anderson Bank

---

3. Ind.Code § 28–1–11–2 provides: "Any bank or trust company shall have power ... to solicit and write insurance as agent or broker for any insurance company authorized to do business in this state, other than a life insurance company."

4. Merchants National subsequently made a commitment that Mid State Bank would transfer to itself all insurance activities from its insurance agency subsidiary and thereafter conduct all such activities directly in the bank.

nor Mid State Bank qualified under this provision. However, the Board agreed with Merchants National's alternative contention that the section 4 prohibitions did not apply to the insurance activities of banking subsidiaries of bank holding companies.

The Board made its September 10, 1987, order effective immediately. In doing so, the Board determined that the moratorium contained in the CEBA did not apply to its approval of Merchants National's application because the action neither "increas[ed] the insurance powers" of Merchants National or its banking subsidiaries in contravention of section 201(b)(3), nor "approve[d] the acquisition" of a bank in contravention of section 201(b)(4). On October 6, 1987, this Court entered a stay of the Board's order pending review.

## Discussion

Our analysis begins and ends with consideration of the moratorium issue because we hold that the issuance of the Merchants National order violates the CEBA moratorium.

■ In construing the moratorium, we recognize the admonition of the Supreme Court that where a statute is "silent or ambiguous" with respect to a specific issue, a court should defer to the construction adopted by the agency administering the statute whenever the agency has adopted a "permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). At the same time we also recognize that *Chevron* enjoins courts to "give effect to the unambiguously expressed intent of Congress." *Id.* Though the classification of congressional intent as clear or ambiguous will sometimes be in the eye of the beholder, courts construing statutes enacted specifically to prohibit agency action ought to be especially careful not to allow dubious arguments advanced by the agency in behalf of its proffered construction to thwart congressional intent expressed with reasonable clarity, under the guise of deferring to agency expertise on matters of minimal

ambiguity. *See Greater New York Hospital Ass'n v. Blum,* 634 F.2d 668, 673 (2d Cir.1980) (agency view of statute more persuasive on issue that does not concern agency's jurisdiction). Congress enacted the CEBA moratorium to stop federal banking agencies from taking certain actions for a one-year interval so that Congress itself could have the opportunity to ·decide how to resolve certain controversies in the banking field. An enactment of that sort must not be given a crabbed interpretation that risks undermining its purpose.

Before examining in detail the two pertinent provisions of the moratorium, it is important to view them together in order to appreciate the evident purpose of Congress. Section 201(b)(4) prohibits the Board from approving a bank holding company's acquisition of a bank unless the acquired bank has agreed to limit its insurance activities to those permitted under section 4(c)(8) of the Bank Holding Company Act. Section 201(b)(3) prohibits any banking agency, including the Board, from issuing any order that has the effect of increasing the insurance powers of a bank holding company or its subsidiary banks. The combined effect of these two provisions is evident: no new insurance activities by bank holding companies or their bank subsidiaries during the moratorium by means of either acquisition of a bank already selling insurance or approval for a previously acquired bank to sell insurance. With this structure of the moratorium in mind, we turn to the Board's efforts to interpret each of the moratorium provisions to permit the Merchants National order.

■ With respect to section 201(b)(4), the Board does not deny that this moratorium provision contemplates precisely the situation presented by the Merchants National application in all but one respect. Though section 201(b)(4) requires the Board to withhold approval of those activities specifically sought to be engaged in by the two bank subsidiaries of Merchants National, the Board points out that section 201(b)(4) applies only to Board approval of *acquisitions* of such banks so engaged. The Board's position is that because the state

bank "acquisitions" were approved in 1986, before the beginning of the moratorium, approval of the subsequent application to resume suspended insurance activities is not subject to the terms of section 201(b)(4).

As applied to the circumstances of Merchants National's acquisitions of the Anderson and Mid State banks, we find the Board's reading of section 201(b)(4) untenable. The acquisitions, approved October 29, 1986, were conditioned upon a commitment by the holding company that the acquired state banks would cease their insurance activities within two years and severely curtail those activities in the interim. These commitments were understood to be necessary "in order to expedite Board approval for the acquisition of the banks," Brief of Respondent at 39. Though it is true that Merchants National's "acquisitions" were approved in a technical sense before the beginning of the moratorium, the reality is that the technique of granting acquisition approval subject to a commitment effectively split each acquisition into two parts, with the second aspect, the commitment, covering the rights to engage in insurance activities. This latter and, for present purposes, critical bundle of rights was not acquired until the commitment was lifted by the September 10, 1987, order under review, and that action was taken during the moratorium.

While we do not criticize the creative approach to expediting approval in this case, such creativity may not be used to thwart the congressional will by splitting an "acquisition" and thus evading the purpose of section 201(b)(4). It is particularly noteworthy that the commitments by Merchants National effectively to cease its acquired banks' insurance activities, which facilitated Board approval of the expedited acquisitions, are the very same conditions

that section 201(b)(4) requires to make permissible an acquisition during the moratorium period that would otherwise be impermissible.[5] The Board's present order completes the acquisitions by lifting conditions during a time when the moratorium requires those conditions to be imposed. We find the irony too much to bear and conclude that the Board's construction of the statutory language would permit an evasion of its purpose under the circumstances of this case.

■ Even were we to agree with the Board's reading of section 201(b)(4), we would in any event hold that its order is plainly covered by section 201(b)(3) of the moratorium. The Board contends that section 201(b)(3) does not apply because the order does not "increas[e] the insurance powers" of either Merchants National or the two Indiana subsidiary banks. The reason for this, argues the Board, is that the term "powers" is used in section 201(b)(3) in some technical or legal sense and that the ban on agency actions "increasing the insurance powers" of a regulated bank refers only to changes made in the bank's organic charter by the chartering authority. The Board supports this novel reading of the unmodified word "powers" by relying on its determination that under section 4 of the Bank Holding Company Act it has no authority to regulate the insurance activities of a state bank subsidiary, and concludes that its order is outside the scope of the "insurance powers" moratorium because Anderson Bank and Mid State Bank "already have these powers by virtue of state law and those powers are not and have never been limited by the [Bank Holding Company] Act." Order at 17, 73 Fed.Res.Bull. at 881.

This reading of the statute does not withstand scrutiny. To begin with, there is

---

**5.** Section 201(b)(4) states that the moratorium imposed by its terms shall not apply:

to the acquisition of a State-chartered bank by a bank holding company that on March 6, 1987, controlled one or more State-chartered banks that have engaged in insurance activities identical to those of the newly acquired institution so long as the bank holding company agrees that it will—

(A) within 2 years of the consummation of its acquisition of the State-chartered bank, divest or terminate that bank's impermissible insurance activities, and

(B) limit the bank's insurance activities during that 2 year period to the renewal of existing policies.

nothing in the statute to suggest that Congress intended only some technical meaning by its use of the word "powers." In fact, the phrase Congress used imposes a moratorium on agency action "that would have the *effect* of increasing the insurance powers," CEBA, § 201(b)(3) (emphasis added), suggesting a broad reading that gives the term "powers" a non-technical, functional meaning. Indeed, upon analysis the Board's reasoning is circular. The argument is that the moratorium applies only to insurance powers increased pursuant to the Board's legal authority, and because the Board believes it has no legal authority over state bank subsidiaries of bank holding companies under section 4 of the Bank Holding Company Act, the moratorium does not apply to its Merchants National order. The fault lies in the middle premise. Whatever the merits of the Board's view that section 4 excludes from the scope of its insurance prohibitions all bank subsidiaries of bank holding companies, the fact remains that the moratorium was enacted in part so that Congress could resolve precisely that issue. The insurance moratorium was imposed in part due to disagreement over the nature and extent *under existing law* of those regulatory "powers" referred to by section 201(b)(3). Congress gave itself until March 1, 1988, to resolve this question free from agency action, and the Board may not ignore the congressional command on the ground that in its view the answer is clear. The scope of section 201(b)(3) must be left sufficiently capacious to include those agency actions bearing on matters withdrawn by Congress during the term of the moratorium.

The legislative history of the moratorium supports this understanding of those agency actions subject to its terms. One of the substantive issues Congress hoped to consider during the moratorium period is the so-called "South Dakota loophole." [6] As the Senate Report explains:

Section 4(c)(8) [of the Bank Holding Company Act], as amended in 1982 by the Garn–St. Germain Act, limits the in-

surance activities of bank holding companies. The scope of those limitations is in dispute. All parties agree that the limitations apply to a bank holding company and its nonbank subsidiaries. Insurance industry groups contend that the limitations also apply to every bank controlled by a bank holding company, whereas bank holding companies contend that the limitations do not apply to banks. Pursuant to the latter argument, a major bank holding company sought to conduct insurance activities beyond those permissible under section 4(c)(8) through a State-chartered bank in South Dakota. Although that application [w]as denied, the so-called "South Dakota loophole" remains a source of controversy.

S.Rep. No. 19, 100th Cong., 1st Sess. 16, *reprinted in* 1987 U.S.Code Cong. & Admin.News 489, 506. *See also id.* at 44; H.Rep. No. 261, 100th Cong., 1st Sess. 148, *reprinted in* 1987 U.S.Code Cong. & Admin.News 588, 617. Though this discussion mentions the issue in the context of the acquisition provision of the moratorium, section 201(b)(4), rather than the increased powers provision, section 201(b)(3), it is clear from this legislative history that the Board's authority to regulate the insurance powers of state chartered banking subsidiaries of bank holding companies under current law was a matter of controversy in the first session of the 100th Congress, and this very controversy in part motivated passage of the moratorium. Whether Congress ultimately agrees or disagrees with the Board's interpretation of section 4 of the Bank Holding Company Act remains to be seen. But in light of the congressional intent to freeze agency action bearing on the contested issue until March 1, 1988, it would undermine the purpose of the moratorium to give it an artificially restricted interpretation, especially one that rests on a resolution of an issue that Congress has temporarily reserved for its own consideration.

---

**6.** · The phrase refers to a controversial South Dakota statute permitting a bank holding company to acquire a state bank for the purpose of engaging in insurance activities through the state bank. *See Citicorp/South Dakota,* 71 Fed. Res.Bull. 798 (1985).

Nor do we find persuasive the Board's reliance on section 201(d) and 201(e)(2) of the moratorium, which provide, respectively, that nothing in Title II shall "be construed to increase or reduce the insurance authority of bank holding companies or banking or nonbanking subsidiaries thereof or of national banks under current law" and that "neither the existence of the moratorium nor its expiration shall be construed to increase, decrease, or affect in any way the authority of State-chartered bank subsidiaries of bank holding companies with respect to insurance activities." These provisions mean only that neither the fact of the moratorium's passage nor its terms should be understood to change existing law as it relates to the "South Dakota loophole" debate.[7] To rely on sections 201(d) and 201(e)(2) in interpreting the moratorium as if this debate never took place is to strip the moratorium's substantive provisions of all force, at least as they relate to state bank subsidiaries. In short, these provisions do not limit the scope of the moratorium itself.

 There remains the question of relief. The Board, relying on section 202 of the CEBA, contends that even if the moratorium is applicable, "the order would not be invalid and the most IIAA would be entitled to is a stay of the order's effective date until the moratorium expires." Brief of Respondent at 47. We disagree. Section 202 permits an agency to issue rulings otherwise subject to the moratorium "if the effective date of such rule, regulation, or order is delayed until the expiration of such moratorium." The Board, however, did not delay the effective date of the Merchants National order, and we decline the invitation to amend the Board's order in order to preserve its validity. It should be unnecessary to remind the Board that the courts must not substitute their own judgment for that of the agency on matters of agency discretion. *See SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). We have no authority to predict that the Board, now advised that the mora-

torium applies to the approval of Merchants National's application, will choose to reissue its order with an effective date of March 1, 1988. The proper course is to vacate the order and permit the Board to proceed as it sees fit in a manner consistent with our decision and applicable law.

In view of our disposition, it is both unnecessary and inappropriate for us to review that portion of the Board's order that concerns the scope of the non-banking prohibitions of section 4 of the Bank Holding Company Act.

The petition for review is granted, and the order of the Board is vacated.

7. *See* 133 Cong.Rec. S3936 (daily ed. Mar. 26, 1987) (colloquy between Sen. Breaux and Sen. Proxmire); *id.* at S3939 (colloquy between Sen. Riegle and Sen. Proxmire); *id.* at S3957 (colloquy between Sen. Dodd and Sen. Proxmire).