890 F.2d 1275
 58 USLW 2329
 INDEPENDENT INSURANCE AGENTS OF AMERICA, INC., Independent
Insurance Agents of New York, Inc., New York State Assoc. of
Life Underwriters, and Professional Insurance Agents of New
York, Inc., Petitioners,
v.
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, Respondent,
Merchants National Corporation, the National Association of
Casualty and Surety Agents, the National Association of Life
Underwriters, the National Association of Professional
Insurance Agents, and the National Association of Surety
Bond Producers, Intervenors.
 No. 1243, Docket 89-4030.
 United States Court of Appeals,
Second Circuit.
 Argued June 1, 1989.
Decided Nov. 29, 1989.
 
 Jonathan B. Sallet, Washington D.C. (Jay L. Alexander, Lisa D. Burget, Miller, Cassidy, Larroca & Lewin, on the brief), for petitioners and insurance-agent intervenors.
 Douglas B. Jordan, Sr. Atty., Bd. of Governors of Federal Reserve System, Washington D.C. (John R. Bolton, Asst. Atty. Gen., U.S. Dept. of Justice, J. Virgil Mattingly, Gen. Counsel, Richard M. Ashton, Associate Gen. Counsel, Bd. of Governors of Federal Reserve System, Washington D.C., on the brief), for respondent.
 
 
 1
 James A. McDermott, Indianapolis, Ind. (Stanley C. Fickle, Barnes & Thornburg, on the brief), for intervenor Merchants Nat. Corp.
 
 
 2
 Paul B. Galvani, Martin E. Lybecker, William L. Patton, Alan G. Priest, Mark P. Szpak, Ropes & Gray, Washington D.C., Laurene K. Janik, Natl. Ass'n of Realtors, Chicago, Ill., submitted a brief for amici curiae Ins. Co. Ass'ns and Nat. Ass'n of Realtors.
 
 
 3
 Robert M. Kurucza, Robert G. Ballen, Steven S. Rosenthal, Debra L. Lagapa, Leslie J. Cloutier, Morrison & Foerster, Washington, D.C., submitted a brief for amicus curiae California Bankers Clearing House Ass'n.
 
 
 4
 Ernest Gellhorn, Robert C. Jones, Jones, Day, Reavis & Pogue, Washington, D.C., submitted a brief for amici curiae Conference of State Bank Supervisors, Independent Bankers Ass'n of America, and Nat. Council of Savings Institutions.
 
 
 5
 John J. Gill, Michael F. Crotty, American Bankers Ass'n, James T. McIntyre, Jr., Randi S. Field, McNair Law Firm, Richard Whiting, Ass'n of Bank Holding Companies, Charles L. Marinaccio, Kelley, Drye & Warren, Washington, D.C., submitted a brief for amici curiae American Bankers Association, Association of Bank Holding Companies, Insurance/Financial Affiliates of America, and Association of Reserve City Bankers.
 
 
 6
 Linley E. Pearson, Atty. Gen., Samuel L. Bolinger, Deputy Atty. Gen., Indianapolis, Ind., submitted a brief for amicus curiae Indiana Dept. of Financial Institutions.
 
 
 7
 Before KAUFMAN, NEWMAN, and MINER, Circuit Judges.
 
 JON O. NEWMAN, Circuit Judge:
 
 8
 The extent to which banks should be permitted to engage in nonbanking activities is a major controversy in this country, attracting the increasing attention of Congress, administrative agencies, and courts. This petition for review of an order of the Board of Governors of the Federal Reserve System ("the Board" or "the Fed") brings before us one facet of that controversy. The issue is whether the Fed was entitled to conclude that section 4 of the Bank Holding Company Act of 1956 ("the Act" or "BHCA") does not restrict bank subsidiaries of a bank holding company from selling insurance. The issue arises on a petition filed by the Independent Insurance Agents of America ("IIAA") challenging the Board's March 3, 1989, order, which permitted two Indiana state banks acquired by the Merchants National Corporation, a bank holding company, to resume specified insurance activities permitted under Indiana law. Merchants National Corp., 75 Fed.Res.Bull. 388 (1989) ("Merchants II "). The Board's order rested upon a determination that the nonbanking prohibitions of section 4 of the Act, as amended, 12 U.S.C. Sec. 1843 (1988), do not apply to the activities of the bank subsidiaries of a bank holding company. Concluding that this construction of section 4 is within the range of reasonable interpretation that the pertinent administrative agency is entitled to make, we deny the petition for review and leave this long-simmering controversy for such further consideration as Congress cares to give it.
 
 Background
 
 9
 Litigation history. This matter is before this Court for the second time. On the prior occasion, we granted IIAA's petition for review after concluding, contrary to the Board's prior decision in this matter, Merchants National Corp., 73 Fed.Res.Bull. 876 (1987) ("Merchants I "), that the Board's authority to permit insurance activities by the bank subsidiaries of Merchants National was temporarily precluded by the moratorium provisions of the Competitive Equality Banking Act of 1987 ("CEBA"), Pub.L. No. 100-86, 101 Stat. 552 (1987), reprinted in 12 U.S.C. Sec. 1841 note (1988). See Independent Insurance Agents of America, Inc. v. Board of Governors, 838 F.2d 627, 633-34 (2d Cir.1988). The moratorium, which was effective from March 6, 1987, to March 1, 1988, prohibited the Fed from issuing any order "that would have the effect of increasing the insurance powers" of a bank holding company or its banking or nonbanking subsidiaries. CEBA Sec. 201(b)(3).
 
 
 10
 In anticipation of the expiration of the moratorium, Merchants National renewed its request that the Board authorize its Indiana banking subsidiaries to engage in insurance activities. After providing notice of this request, 52 Fed.Reg. 8966 (1987), and assessing the comments that were received, the Board issued the order that is the subject of the pending petition for review. This Court granted a stay of the order pending oral argument and continued the stay pending decision.
 
 
 11
 The statutory framework. Before introducing the facts, it will be helpful to outline briefly the pertinent statutory provisions of the Bank Holding Company Act. The principal regulatory powers of the Fed concerning bank holding companies are set forth in sections 3 and 4 of the Act. 12 U.S.C. Secs. 1842, 1843. Section 3 requires Board approval of the acquisition of ownership or control of any bank by a bank holding company, with narrow exceptions not here relevant. Section 3 sets forth factors governing acquisition approval, focusing on the competitive effect of the proposed acquisition, the financial and managerial resources of both the holding company and the acquired bank, and the convenience and needs of the community served. 12 U.S.C. Sec. 1842(c).
 
 
 12
 Section 4 of the Act, the focal point of the Board's order in this case, contains two sets of prohibitions. First, it specifies, in what might be called the "ownership clause," that a bank holding company may not "retain direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company." 12 U.S.C. Sec. 1843(a)(2). Second, it provides, in what might be called the "activities clause," that a bank holding company may not "engage in any activities other than (A) those of banking or of managing or controlling banks ... and (B) those permitted under [section 4(c)(8) of the Act]...." Id. Section 4(c)(8) sets forth the so-called "closely related to banking" exception to the nonbanking provision. Id. Sec. 1843(c)(8). In relevant part, section 4(c)(8) states that the section 4(a) nonbanking prohibitions shall not bar ownership by a bank holding company of:
 
 
 13
 shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto, but for purposes of this subsection it is not closely related to banking or managing or controlling banks for a bank holding company to provide insurance as a principal, agent or broker....
 
 
 14
 Id.
 
 
 15
 Facts. A number of states, including Indiana,[1] historically have authorized state-chartered banks to provide insurance services to their customers. On July 1, 1986, Merchants National Corporation, a bank holding company within the meaning of the BHCA, 12 U.S.C. Sec. 1841(a), sought permission from the Fed to acquire the stock of two banks chartered under the laws of the State of Indiana, the Anderson Banking Company ("Anderson Bank") and the Mid State Bank of Hendricks County ("Mid State Bank"). Both of these state banks had engaged in general insurance activities prior to the date of Merchants National's applications, Anderson Bank directly since its incorporation in 1916, and Mid State Bank since its purchase of an insurance agency in 1985. Merchants National subsequently made a commitment that Mid State Bank would transfer to itself all insurance activities from its insurance agency subsidiary and thereafter conduct all such activities directly in the bank.
 
 
 16
 The initial Merchants National applications were protested by various insurance industry trade groups, including the IIAA, on the ground that the provisions of section 4 of the Act apply to the insurance activities of state banks owned by bank holding companies and therefore that the acquisitions of Anderson Bank and Mid State Bank could not be approved without termination of their insurance activities to the extent required under section 4. In response to the protests, Merchants National committed that it would cause the banks to divest their insurance agency activities within two years unless, within that time, it received Board approval for the banks to retain their insurance activities. Merchants National agreed that, prior to such approval, the banks would limit their insurance activities to the renewal of existing policies. In light of these commitments, the Board approved the applications on October 29, 1986. 72 Fed.Res.Bull. 838 (1986).
 
 
 17
 On February 5, 1987, Merchants National filed an application seeking Board approval for Anderson Bank and Mid State Bank to resume the insurance activities that had just been suspended pursuant to the acquisition commitments. Merchants National sought permission on two alternative grounds. First, it contended that Anderson Bank and Mid State Bank were exempt from the insurance provisions of section 4 of the Act pursuant to the "grandfather" provision of section 4(c)(8)(D), as amended, 12 U.S.C. Sec. 1843(c)(8)(D), under which a bank holding company or any of its subsidiaries is permitted to engage in insurance agency activity in which the holding company or the subsidiary was engaged on May 1, 1982, subject to certain geographical and functional limitations. Second, Merchants National sought more broadly a determination that the nonbanking prohibitions of section 4 of the Act do not apply to activities conducted directly by banking subsidiaries of a bank holding company. In Merchants I, the Board rejected the first contention but agreed with the second one. After the prior appeal to this Court and the expiration of the moratorium, the Board issued the decision challenged on this petition for review. Merchants II.
 
 The Board's Decision
 
 18
 The core of the Board's decision in Merchants II was its conclusion, previously expressed in Merchants I, that the provisions of section 4 limiting the nonbanking activities of bank holding companies do not apply to bank subsidiaries of a bank holding company. Consistent with this view, the Board also ruled, as it had in Merchants I, that section 4's prohibition upon a bank holding company's acquisition of a nonbanking entity (unless that entity engages only in activities "closely related to banking") does not apply to a holding company's acquisition of a bank. The Board recognized an exception to this latter conclusion in those instances, illustrated by the Citicorp (South Dakota) case, 71 Fed.Res.Bull. 789 (1985), where the Board finds an evasion arising from a holding company's acquisition of an entity that purports to be a "bank" but engages in insignificant banking activities, indicating that the acquisition is "primarily, if not solely" for the purpose of enabling the holding company to engage in the target's nonbanking activities.[2] Merchants II, Fed.Res. slip op. at 8 n. 11.
 
 
 19
 The Board grounded its conclusions on several considerations. First, the Board pointed out that the limitations of section 4(a)(2) apply in express terms to "bank holding companies," not to "banks." Id. at 11. Second, the Board relied on what it considered a structural argument: the "ownership clause" of section 4 restricts the entities that a bank holding company may acquire or retain, and the "activities clause" restricts the activities that the bank holding company itself may engage in. In the Board's view, if the restriction on activities applied to the activities of subsidiaries of a bank holding company, the restriction on acquisition or retention of nonbank entities would be superfluous. Id. at 11-13. Third, the Board emphasized that the restriction on acquisition or retention was broadly phrased to prohibit "direct or indirect" ownership, whereas the restriction on engaging in activities omitted the comparable adverbs "directly or indirectly," words the Board appears to acknowledge would have made the restrictions of section 4 applicable to activities of a bank holding company's subsidiaries. Id. at 12-13. Fourth, the Board asserted that since the enactment of the Bank Holding Company Act, it has consistently declined to read the activities restriction of section 4 as applicable to bank subsidiaries of a bank holding company. Id. at 15-16. Fifth, the Board found in the legislative history of the Bank Holding Company Act and its subsequent amendments a congressional purpose to leave the scope of permissible activities of bank subsidiaries of a bank holding company subject only to the authority that issued the banks' charter, without any further restriction from the Act itself.[3] Id. at 17-20.
 
 
 20
 The Board also reckoned with and rejected an argument based on section 101(d) of CEBA, which amends section 3 of BHCA to permit qualified state-chartered savings banks to engage in any activity permitted by state law, but prohibits such banks from violating the insurance restrictions of section 4(c)(8). 12 U.S.C. Sec. 1842(f). It was contended that if section 4 did not restrict the nonbanking activities of bank subsidiaries of a bank holding company, an exemption for savings banks would not have been necessary. The Board responded that this amendment may have been adopted to confirm the Board's view in the face of arguments advanced by insurance trade associations and to provide special limitations applicable only to savings bank subsidiaries of a bank holding company. In this connection, the Board emphasized that Congress had considered and declined to enact legislation to extend the restrictions on savings bank subsidiaries to all bank subsidiaries of a bank holding company. Merchants II, Fed.Res. slip op. at 23-24; see H.R.Conf.Rep. No. 261, 100th Cong., 1st Sess. 130 (1987), U.S.Code Cong. & Admin.News 1987, pp. 489, 588, 599; S.Rep. No. 19, 100th Cong., 1st Sess. 33 (1987), U.S.Code Cong. & Admin.News 1987, pp. 489, 523.
 
 
 21
 Finally, the Board noted that its decision leaving the activities of bank subsidiaries to regulation by the chartering authority applied only to activities carried on directly by those banks and did not insulate from section 4 the activities of subsidiaries of the bank subsidiaries. This application of section 4 to third generation entities, those owned by the subsidiaries of a bank holding company, was based on section 2(g)(1) of the Act, 12 U.S.C. Sec. 1841(g)(1), which provides that shares of such third generation entities are deemed to be held indirectly by the bank holding company; as a result, whether such entities may be owned by a subsidiary of a bank holding company is governed, in the Board's view, by section 4's limitation on entities that may be owned by a bank holding company. Merchants II, Fed.Res. slip op. at 25.
 
 Discussion
 
 22
 There can be no doubt that the Bank Holding Company Act is "intended to implement a congressional policy against control of banking and nonbanking enterprises by a single business entity." See Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 46, 100 S.Ct. 2009, 2020, 64 L.Ed.2d 702 (1980). What is less clear is the extent to which Congress has decided to implement that policy. IIAA contends that Congress has required a nearly complete separation of banking and nonbanking activities, precluding bank holding companies and all entities within their systems from engaging in nonbanking activities other than the "closely related to banking" activities specifically identified in section 4(c)(8) of the Act. The Board believes that Congress has not gone so far. In its view, Congress required a significant degree of separation with respect to bank holding companies themselves, but did not wish to displace the traditional authority of state and national bank chartering authorities to determine what nonbanking activities could appropriately be engaged in by banks that are subject to their jurisdiction, even though such banks were owned by a bank holding company under the jurisdiction of the Fed.
 
 
 23
 In resolving this dispute, we must keep in mind that we are not making an initial construction of a statute, but rather reviewing a construction made by an expert regulatory agency. In that context, our task is to determine whether Congress has "directly spoken to the precise question at issue," and, if so, to give effect to any "unambiguously expressed intent of Congress," or, if not, to determine "whether the agency's answer is based on a permissible construction of the statute." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Though both sides support their views of the statute by relying on some of the statutory language, we cannot say that the provisions of the Act reveal an unambiguous congressional intent concerning the precise question at issue. We find no provision that says, in substance, "The Board may not regulate the activities of bank subsidiaries of bank holding companies," or "Bank subsidiaries of bank holding companies may engage in nonbank activities to the extent permitted by their chartering authorities." The Board reads the Act as if it contained such language. On the other hand, we find no provision that says, in substance, "Bank subsidiaries of bank holding companies may not engage in nonbank activities." The IIAA reads the Act as if it contained this wording. The question for us is whether the Board's interpretation of the language that does appear in the Act is reasonable, an inquiry we undertake by examining all relevant sources, including such clues as the statutory language may provide.
 
 
 24
 Both sides claim that the text of the Act supports their interpretations, and each can find some, but not overwhelming, support in various words and phrases. As the Board noted in its decision, the limitations of section 4(a)(2) apply in terms to "bank holding companies," not to "banks." However, that observation somewhat begs the question, which is whether the limitations upon bank holding companies should be interpreted to restrict the activities those entities may engage in indirectly through their banking subsidiaries. Of similarly little, if any weight, is the argument that because the "ownership clause" of section 4(a)(2) does not bar a bank holding company from owning subsidiary banks, the "activities clause" should be interpreted not to apply to activities of subsidiary banks. The argument is a non sequitur. It would be entirely sensible for Congress, if it wished, to bar a bank holding company from owning nonbanks and also prohibit a bank holding company from engaging indirectly in nonbank activities conducted by its bank subsidiaries. For its part, the IIAA points to the language prohibiting bank holding companies from engaging in nonbank activities and assumes that this language means "engage in directly or through subsidiaries."
 
 
 25
 Somewhat more supportive of the Board's position are textual arguments arising from comparisons of the "activities clause" with other language in section 4(a)(2). First, the grandfather proviso of section 4(a)(2) permits a bank holding company to engage in those activities "in which directly or through a subsidiary" it was engaged in at designated times and under designated circumstances. The Board points out that no similar phrase modifies the "activities clause." Second, the "ownership clause" prohibits the retention of "direct or indirect" ownership of nonbanks, and no similar phrase modifies the prohibition on engaging in nonbank activities. The use of these phrases in section 4(a)(2) and their absence from the "activities clause" might imply a deliberate congressional choice not to restrict the activities of bank subsidiaries, cf. Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (significance of different wording in statute), but might also result from drafting different clauses at different times and assembling them without intending differences in phrasing to have significance.
 
 
 26
 The Board derives a somewhat stronger argument for its interpretation from the structure of the Act. It points out that if the "activities clause" applied to subsidiaries of a bank holding company, the "ownership clause" would be virtually superfluous, since, under that reading, the "activities clause" alone would preclude a bank holding company from owning a nonbank. Moreover, as the Board further points out, such a reading would appear to create some internal inconsistencies. For example, section 4(c)(14) permits a bank holding company, under specified circumstances, to own an export trading company; however, this would be prohibited if the "activities clause" applied to subsidiaries of a bank holding company since that clause exempts only the "closely related to banking" activities set forth in section 4(c)(8), which do not include export trading. IIAA's only response is that the (c)(14) exemption would control over the (a)(2) "activities clause" since it comes later in the statute. See Lodge 1858 v. Webb, 580 F.2d 496, 510 (D.C.Cir.), cert. denied, 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978). That canon of construction may sometimes be helpful in resolving irreconcilable inconsistencies, but it need not be invoked where the statute may be interpreted to avoid the inconsistency in the first place.
 
 
 27
 However, IIAA also finds support for its interpretation in the structure of section 4. As IIAA points out, section 4(c)(8), establishing the circumstances for exempting various entities from the restrictions of section 4, including the "activities clause" of section 4(a)(2), uses the term "company" to describe those entities, and "company" is defined by section 2(b) broadly enough to include a bank. See 12 U.S.C. Sec. 1841(b). Moreover, section 4(c)(8) instructs the Board, in deciding whether a particular activity is "a proper incident to banking," to assess whether the performance of that activity "by an affiliate of a holding company" will produce public benefits, and "affiliate" is defined by section 2(k) to include a "company" and, hence, a bank. See 12 U.S.C. Sec. 1841(k). The available inference is that subsidiary banks are subject to the "activities clause" because they are within the category of entities exempted from that clause by section 4(c)(8).
 
 
 28
 Perhaps the most perplexing aspect of the structural arguments concerns the Board's contention that though it has no authority to preclude bank subsidiaries of a bank holding company from engaging in nonbank activities, it does have authority to preclude the subsidiaries of a bank subsidiary from engaging in nonbank activities. Thus, the Board adopts a generation-skipping approach: It may prohibit nonbank activities by bank holding companies and by their "grandchildren," i.e., the subsidiaries of their bank subsidiaries, but not by their bank "children," i.e., the holding companies' immediate bank subsidiaries. The Board's rationale is that the prohibition in the "ownership clause" on "direct or indirect" ownership of nonbank entities precludes a bank holding company from indirectly owning the nonbank subsidiary of its own bank subsidiary.
 
 
 29
 This contention elicits conflicting responses from IIAA and Merchants National. IIAA contends that the Fed can prohibit nonbanking activities at all three levels and cites the apparent awkwardness and perhaps illogic of the Board's generation-skipping approach as evidence that the Board's interpretation of the "activities clause" is incorrect. As IIAA points out, under the Board's reading of section 4(a)(2), a holding company's bank subsidiary that owns a nonbank subsidiary can escape the prohibition of the "ownership clause" by merging the "grandchild" into the bank subsidiary and operating the nonbank activities itself. That is precisely what Mid-State Bank did in this proceeding. For its part, Merchants National argues that the Fed may bar nonbanking activities only of a holding company itself and may not preclude those of either second generation bank subsidiaries or their third generation subsidiaries.
 
 
 30
 IIAA's position has the virtue of consistency in reading the Act to preclude nonbank activities throughout a bank holding company's system. Moreover, if the Board is correct that Congress wished to leave the activities of bank subsidiaries subject to the regulation of only their chartering authorities, one is left to wonder why those authorities were not relied on to control all of a bank subsidiary's activities, whether conducted directly by the bank subsidiary itself or indirectly through its own subsidiary. On the other hand, if the Board is right that the Act leaves the nonbank activities of bank subsidiaries within the control of bank chartering authorities but precludes nonbank activities by holding companies and by the subsidiaries of their bank subsidiaries, this would not be the first time that Congress has adjusted the competing positions of strong forces with a compromise of imperfect symmetry. See Board of Governors v. Dimension Financial Corp., 474 U.S. 361, 374, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986). We think it prudent not to resolve the issue of the Board's authority over the nonbank activities of subsidiaries of bank subsidiaries until that issue is squarely presented.
 
 
 31
 IIAA endeavors to support its interpretation of the "activities clause" with isolated quotations from the legislative history of the Act. Some members of Congress expressed the view that the Act was intended to keep "banks" out of nonbank activities. As Congressman O'Hara put it, "I do not think, however, that any of my colleagues will question the soundness of the rule that banks should stick exclusively to banking and should be as free of nonbanking interests as C[ae]sar's wife from suspicion." 101 Cong.Rec. 8033 (1955). See also 102 Cong.Rec. 6853 (1956) (statement of Sen. Barkley); 101 Cong.Rec. 8030 (1955) (statement of Rep. Rains); id. at 8035 (statement of Rep. Multer); id. at 8184 (statement of Rep. Smith).
 
 
 32
 These remarks do not provide unambiguous support for IIAA's interpretation for several reasons. First, in some instances, it is not clear if the legislator is referring to bank subsidiaries of bank holding companies or to the holding companies themselves. Second, many expressions condemning nonbank activities, including one that explicitly mentions banks and bank holding companies, see 102 Cong.Rec. 6853 (1956) (statement of Sen. Barkley), focus on ownership interests, rather than the business activities that a bank subsidiary may conduct. Plainly, as the "ownership clause" commands, Congress did not want bank holding companies to own nonbanks. The legislative history, however, is remarkably free of clear statements indicating disapproval of nonbanking activities engaged in directly by bank subsidiaries. If such were the intent of Congress, one would expect to find a clear statement of such purpose in the key House and Senate reports. Finally, during the hearings the attention of Congress was specifically called to the range of activities that state chartering authorities were permitting for bank subsidiaries of bank holding companies, see Control and Regulation of Bank Holding Companies: Hearings on H.R. 2674 Before the House Comm. on Banking and Currency, 84th Cong., 1st Sess. 536, 553 (1955) (testimony of Ellery C. Huntington), and some Congressmen expressed the view that the holding company bill would not modify such state regulatory authority, id. at 553 (statements of Rep. Spence and Rep. Brown).
 
 
 33
 Subsequent legislative forays into the field, though an uncertain source of prior congressional intent at best, see Russello v. United States, 464 U.S. at 26, 104 S.Ct. at 302, reveal primarily that Congress finds this a difficult area in which to provide clear answers. In connection with the 1970 amendments to the Act, the House Committee on Banking and Currency reported a bill that, among other things, explicitly excluded insurance activities from the "closely related to banking" activities permitted under section 4(c)(8). H.R.Rep. No. 387, 91st Cong., 2nd Sess. 9 (1969), U.S.Code Cong. & Admin.News 1969, p. 5519. Referring to the effect of this and another prohibition concerning sale of mutual funds, the Committee stated:
 
 
 34
 It should be emphasized that these two prohibitions apply only to the bank holding company and its nonbanking subsidiaries and not to the bank subsidiaries of bank holding companies whose insurance agency and mutual fund operations are governed by other Federal and State laws. This is in keeping with the original concept of the 1956 act, which was to regulate bank holding companies and not subsidiary banks.
 
 
 35
 Id. at 15. The House then went further and amended the bill to identify a list of activities explicitly prohibited both to bank holding companies and all of their subsidiaries, including banks. 115 Cong.Rec. 33133-35. The Senate disagreed with this approach, see S.Rep. No. 1084, 91st Cong., 2d Sess. 12-16 (1970), U.S.Code Cong. & Admin.News 1970, p. 5519, and it was rejected in conference. H.R.Conf.Rep. No. 1447, 91st Cong., 2d Sess. 13-16 (1970).
 
 
 36
 Finally with respect to subsequent legislative attention, some significance must be attached to the fact that Congress specifically called to its own attention the correctness of the Board's interpretation of the "activities clause" in Merchants I by enacting the moratorium provisions of CEBA and providing itself with a one-year opportunity to determine whether to legislate contrary to the Board's view. The moratorium expired without the passage of new legislation on this subject.
 
 
 37
 Case law has not directly focused on the issue now before us, but two decisions provide the Board with some comfort. When investment companies challenged the Board's determination that the services of an investment adviser to a closed-end investment company were "closely related to banking" under section 4(c)(8), they argued that the Board was allowing subsidiary banks to render such services. See Board of Governors v. Investment Company Institute, 450 U.S. 46, 59 n. 25, 101 S.Ct. 973, 983 n. 25, 67 L.Ed.2d 36 (1981). The Supreme Court disagreed and noted with apparent approval the Board's view that whether such services could be rendered by subsidiary banks depended solely on the decisions of their chartering authorities:
 
 
 38
 The simple answer to this argument is that not only does the interpretive ruling confer no authorization to undertake any activities, but also the Board does not have the power to confer such authorization on banks. As the Board's opinion in this case stated:
 
 
 39
 "[T]he Board's regulation ... authorizes investment advisory activity to be conducted by a nonbanking subsidiary of the holding company. The authority of national banks or state member banks to furnish investment advisory services does not derive from the Board's regulation; such authority would exist independently of the Board's regulation and its scope is to be determined by a particular bank's primary supervisory agency."
 
 
 40
 Id. Tilting in the same direction is Cameron Financial Corp. v. Board of Governors, 497 F.2d 841, 848 (4th Cir.1974), which ruled that a bank subsidiary is not included within the term "subsidiary" for purposes of the grandfather provisions of section 4(a).
 
 
 41
 After assessing all of the relevant considerations, we are satisfied that the Board, acting within its sphere of competence, has made a reasonable interpretation of section 4(a)(2), one that confides decisions concerning the scope of insurance and other nonbank activities of bank subsidiaries to their national and state chartering authorities. If that interpretation is to be altered, Congress will have to enact suitable legislation.
 
 
 42
 The petition for review is denied.
 
 
 
 [1]
 Ind.Code Sec. 28-1-11-2 provides: "Any bank or trust company shall have power ... to solicit and write insurance as agent or broker for any insurance company authorized to do business in this state, other than a life insurance company."
 
 
 [2]
 The Board decided Citicorp in the exercise of its authority under section 5 of the Act, 12 U.S.C. Sec. 1844. The Supreme Court subsequently ruled that section 5 "only permits the Board to police within the boundaries of the Act." Board of Governors v. Dimension Financial Corp., 474 U.S. 361, 373 n. 6, 106 S.Ct. 681, 688 n. 6, 88 L.Ed.2d 691 (1986). We do not decide whether, in light of Dimension Financial, Citicorp was a proper exercise of the Commission's authority under section 5 or any other provision of the Act
 
 
 [3]
 Though concluding that the provisions of section 4 do not apply to bank subsidiaries of a holding company, the Board somewhat inconsistently also concluded, as it had in Merchants I, that neither Anderson Bank nor Mid State Bank qualifies under the grandfather provision of the Garn-St. Germain Depository Institutions Act of 1982, which is section 4(c)(8)(D) of the Bank Holding Company Act. The Board pointed out that Anderson Bank did not become a subsidiary of a bank holding company and Mid State Bank did not start selling insurance until after the May 1, 1982, grandfather date. If, as the Board concluded, section 4 is inapplicable to bank subsidiaries of a bank holding company, it is not readily apparent why the grandfather clause of section 4(c)(8) was inapplicable on the narrow ground that its precise terms were not met, rather than the broader ground that section 4, to which the clause is an exception, has no application to banking subsidiaries. Indeed, it is the Board's position that "the Garn-St. Germain Act has no applicability to situations ... where the nonbanking provisions of section 4 of the [Bank Holding Company] Act do not apply." Merchants II, Fed.Res. slip op. at 8 n. 10. Perhaps the Board simply felt it prudent to reckon with the first of Merchant National's alternative arguments and reject it on a narrow ground before proceeding to the second argument, which presented the broader ground